CITY OF DALLAS, TEXAS, §
§
    Plaintiff, §
§
v. §
§
H. DALE HALL et al., §      CIVIL ACTION NO.
§
    Defendants. §      3:07-CV-0060-P
§
_____ §
§      Consolidated with:
THE TEXAS WATER §
DEVELOPMENT BOARD, §
§      Civil Action No. 3:07-CV-0213-P
    Plaintiff, §
§
v. §
§
THE UNITED STATES DEPARTMENT §
OF THE INTERIOR et al., §
§
    Defendants. §

## MEMORANDUM OPINION AND ORDER

Now before the Court are (1) the Federal Defendants' Motion to Dismiss Plaintiff City of Dallas' Eighth, Ninth, Tenth, Eleventh, and Twelfth Claims for Relief, filed March 26, 2007; (2) the Federal Defendants' Motion to Dismiss Plaintiff Texas Water Development Board's Sixth and Seventh Claims for Relief, filed March 23, 2007; and (3) the Motion to Dismiss of Defendants James Yount and Annie Lyles Yount, filed April 12, 2007. After careful consideration of the Parties' briefing and the applicable law, the Court hereby GRANTS the Federal Defendants' Motion to Dismiss Plaintiff City of Dallas' Eighth, Ninth, Tenth, Eleventh, and Twelfth Claims for Relief and

hereby DISMISSES with Prejudice Counts VIII, IX, X and XII of the City of Dallas's Complaint. Count XI is dismissed subject to the City filing an amended complaint within ten (10) days from the date of this order. Further, the Court hereby GRANTS the Federal Defendants' Motion to Dismiss Plaintiff Texas Water Development Board's Sixth and Seventh Claims for Relief and hereby DISMISSES with Prejudice Counts Six and Seven of the State's Complaint. The Court also GRANTS the Younts' Motion to Dismiss.[1]

## BACKGROUND

The City of Dallas (the "City") and the Texas Water Development Board (the "State") (collectively, "Plaintiffs") have filed these consolidated lawsuits against the Federal Defendants[2] and James and Annie Yount seeking reversal of the United States Fish and Wildlife Service's ("FWS") decision to establish the Neches River National Wildlife Refuge ("Refuge") without preparing an Environmental Impact Statement or an adequate Environmental Assessment as required by the National Environmental Policy Act. Plaintiffs also ask the Court to declare the legal rights and relations among the Parties, to require FWS to comply with certain Executive Orders, to rescind a deed purporting to transfer a conservation easement into the Refuge, and to enjoin the acquisition of real property for the Refuge.

---

[1] The Local Rules of this Court limit a party's briefing to twenty-five pages. (*See* Local Rule 7.2(c).) In an effort to circumvent this rule, the City of Dallas has put the majority of its legal citations in footnotes. By relegating virtually all its legal authority to single-spaced, ten-point font footnotes, the City of Dallas was able to avoid compliance with the Court's page limitation. In the future, the Court will not tolerate this improper overuse of footnotes.

[2] The Federal Defendants include Defendant H. Dale Hall, in his official capacity as Director of the United States Fish and Wildlife Service, Dick Kempthorne, in his official capacity as the Secretary of the United States Department of the Interior, Benjamin N. Tuggle, in his official capacity as the Regional Director of the Southwest Region (Region 2) of the United States Fish and Wildlife Service, and the United States Department of the Interior.

The National Wildlife Refuge System comprises various fish, wildlife, and waterfowl refuges administered by the Secretary of the Interior through FWS. On June 11, 2006, FWS designated a 25,281-acre site within Anderson and Cherokee counties, Texas as the Neches River National Wildlife Refuge. Plaintiffs allege that FWS's administrative decision to establish the Refuge was plagued with procedural flaws and statutory violations.

According to Plaintiffs, the City and the State have contemplated for decades development plans for a reservoir on the Upper Neches River to serve the future water needs of its residents and other customers. (City Compl. ¶ 19; State Compl. ¶ 22.)[3] This proposed reservoir is known as the Fastrill Reservoir. (AR 1178.)[4] Yet despite knowing of the City and the State's interest in possibly utilizing the land for this purpose, the federal government established a Refuge on the same land in bad faith and without complying with the relevant statutory requirements.

## I.

A brief overview of the statutes and regulations creating the administrative framework, terminology, and policies helps to understand this case. After describing the bureaucratic order, the Court will turn to the factual and procedural background.

## A.   National Environmental Policy Act.

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-61 (1982), was established to ensure that federal agencies carefully consider the environmental impacts of their projects and that information about those impacts will be made available to the public. *SeeSpiller*

---

[3]     Plaintiff Texas Water Development Board ("TWDB") is an agency of the State of Texas that is authorized by the state to acquire and develop water storage facilities, including reservoirs.

[4]     References to the Administrative Record will be cited as "AR."

*v. White*, 352 F.3d 235, 237 (5th Cir. 2004.)   The act  was intended to reduce or eliminate environmental damage and to promote the understanding of the ecological systems and natural resources important to the United States.   *See id.*  To that end, NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all  "major federal actions significantly [affecting] the quality of the human environment." 42 U.S.C. § 4332(C).  NEPA itself does not mandate particular results, rather NEPA imposes procedural requirements on federal agencies, requiring them to analyze the environmental impact of their proposals and actions.  *See Coliseum Square Assoc., Inc.  v.  Jackson*, 465 F.3d at 215, 223 (5th Cir. 2006.)

Under NEPA regulations, an agency undertaking an action is required to determine whether  its proposal requires an EIS.  40 C.F.R. § 150.4(a).  The agency will first prepare a more limited  Environmental Assessment ("EA") to determine whether an EIS is required.  *See* 40 C.F.R. §  1501.4(b).  The EA is a concise public document that serves to briefly provide sufficient evidence  and analysis for determining whether to prepare an EIS.  *See Coliseum Square*, 465 F.3d at 224  (citing 40 C.F.R. § 1508.9(a)).  If the agency determines, based on the EA, that no EIS is needed  because the action would not significantly affect the environment, it must issue a 'finding of no  significant impact' ("FONSI"), which briefly presents the reasons why the proposed agency action  will not have a significant impact on the human environment.  *See* 40 C.F.R. §§ 1501.4(e), 1508.13.  Otherwise, the agency must prepare an EIS.

An EIS must describe the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided should the proposal be implemented, alternatives to the  proposed action, and any irreversible and irretrievable commitments of resources that would be involved if the proposed action should be implemented.  *See* 42 U.S.C. § 4332(2)(C).

4

**B.     National Wildlife Refuge System.**

The mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *See* 16 U.S.C. § 668dd(a)(2). The Secretary of the Interior is responsible for administering the system pursuant to the National Wildlife Refuge System Administration Act. *See id.* § 668dd(4).

**C.     Administrative Procedure Act.**

The United States' sovereign immunity operates as a complete bar to lawsuits, even those filed by the states. *See California v. Arizona*, 440 U.S. 59, 61-62 (1979). In order to pursue their claims, Plaintiffs must establish that the United States has waived its immunity with respect to this lawsuit.

The Administrative Procedures Act ("APA") provides a waiver of sovereign immunity for actions based on federal agency decisions. The APA provides judicial review for final agency decisions when a person is adversely affected or aggrieved by agency action. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof. An action . . . seeking relief other than money damages . . . shall not be dismissed . . . on the ground that it is against the United States.") The waiver is limited. It does not "confer[ ] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*

The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* § 706(2)(A).

**D.    Executive Orders Nos. 13,132 and 13,352.**

Executive Order No. 13,132 was signed by President Bill Clinton on August 4, 1999. The Executive Order addresses how federal agencies shall maintain the basic precepts of federalism when they formulate and implement federal policy. *See* Exec. Order No. 13,132, 64 Fed. Reg. 4,325 (Aug. 4, 1999). President George W. Bush signed Executive Order 13,352 on August 26, 2004, which was intended to promote cooperative conservation with respect to actions relating to the use, enhancement, and enjoyment of natural resources and/or protection of the environment and to promote collaborative activity among federal, state, and local officials. *See* Exec. Order 13,352, 69 Fed. Reg. 52,989 (Aug. 26, 2004).

**II.**

The Court now turns to the factual and procedural history of this case.

**A.    Early History of the Land.**

As early as 1961, the upper portion of the Neches River area was identified as a site for the potential Fastrill Reservoir. (State Compl. ¶ 23.) The State of Texas' 1984 Texas Water Plan identified a large portion of that same area for a water reservoir. (State Compl. ¶ 23.)

In 1985, FWS identified the same site as potentially deserving wildlife reserve protection. (AR 1964.) In 1988, FWS approved a preliminary proposal to conduct additional planning for a refuge. Yet, because there was not enough money at the time to fund this research and planning, no action was taken.

Again in 1997, the State of Texas' Water Plan identified the Fastrill Reservoir as an "alternate water supply development site." (State Compl.¶ 23.) And in 2001, the TWDB identified the Fastrill Reservoir as a desirable future reservoir site. (City Compl. ¶ 29.)

In 2003, the refuge project was reactivated by FWS.

**B.    2004.**

In July 2004, FWS held workshops to study the area and to provide information to area landowners regarding the land that was proposed for the Refuge. (AR 1204, 1971 (as explained in the EA and FONSI).) On October 13, 2004, FWS gave a presentation to the East Texas Water Planning Group and other members of the public about the potential establishment of the Refuge.  (AR 1204, 1971.)

**C.    2005.**

On March 9, 2005, the Dallas City Council passed a resolution approving consideration of the Fastrill Reservoir and expressing its desire to work cooperatively with the Upper Neches Regional Municipal Water Authority ("UNRMWA") and FWS to determine if the Fastrill Reservoir could meet the dual objectives of water supply and wildlife preservation. (City Compl. ¶ 26.) On March 16, 2005, the Director of Dallas Water Utilities sent a letter to the Regional Chief of the National Wildlife Refuge System informing FWS of the City Council's resolution. (City Compl. ¶ 27.) The letter also requested that FWS postpone the Refuge proposal to allow a study to determine how a wildlife refuge and a reservoir could co-exist. (City Compl. ¶ 36.)

In March 2005, FWS released to the public a 93-page proposal to establish the Refuge on the Neches River. The proposal contained a Refuge proposal, the Environmental Assessment, a

conceptual management plan, and a land protection plan. (AR 1164-1269.) The EA reviewed two Refuge alternatives, with one containing more land than the other. The EA did not offer an alternative that would allow the Refuge and the Fastrill Reservoir to co-exist. These documents underwent public review beginning March 15, 2005 and ending May 31, 2005. (AR 1972 (as detailed in the FONSI).)

On April 13, 2005, the Dallas City Council approved funding for a formal feasibility study for the Fastrill Reservoir. Also in April 2005, FWS issued a Fiscal Impact Analysis of Land Acquisition Alternatives to the public. (AR 1269-1283.) That document did not analyze the fiscal impact on the City of establishing the Refuge.

On May 10-11, 2005 FWS conducted public hearings regarding the Environmental Assessment.

In July 2005, the regional FWS office issued a Finding of No Significant Impact and elected to proceed with the proposed Refuge. In the FONSI, FWS stated it did not believe an Environmental Impact Statement was necessary based on its review and evaluation of the information contained in the EA. (AR 1966.) FWS determined that the Refuge would have no significant impact on "the human environment within the meaning of Section (102)(2)(c) of [NEPA]." (AR 1966.) FWS acknowledged its obligation to consider the cumulative impact of any proposal that included the Fastrill Reservoir and the Refuge existing together. However, FWS determined that the Fastrill Reservoir was speculative in the short term, not definitive in scope and purpose, and far beyond the planning horizon of the Refuge proposal. Consequently, FWS determined it could not "formally evaluate combined or cumulative impacts or details of how the two projects might interface while

not attenuating the mutual goals of each project." (AR 1966.) The FONSI was submitted to the Director of FWS for his approval.

On August 16, 2005, the Texas Senate passed a resolution that recognized a need for additional water resources in the Dallas region and identified the Fastrill Reservoir project as a critical resource that could help meet the water supply requirements of the region.

In late-2005, various local and state officials wrote to the Director of the FWS asking him to postpone approval of the Refuge pending completion of the City's feasibility study. Reservoir proponents also asked the FWS Director to meet with them to try to develop a compromise plan that would enable the reservoir and the Refuge to co-exist.

**D.    2006.**

On April 3, 2006, the FWS Director met with reservoir proponents in Washington, D.C. At that meeting, the reservoir proponents again tried to convince him not to approve the FONSI and the Refuge. The Director of the FWS gave the reservoir proponents until June 1, 2006 to present a viable alternative to the Refuge plan. On April 20 and May 10, 2006, FWS and the reservoir proponents met to work on developing an alternative proposal(s). As of June 1, no viable alternative plan(s) had been proposed and on June 11, 2006, the FWS Director approved the EA and the FONSI, thereby designating a 25,281-acre site within Anderson and Cherokee Counties, Texas, as the Neches River National Wildlife Refuge and authorizing FWS to begin acquiring property for the Refuge. (AR 2662, 2676, 2682.)

On June 12, 2006, FWS began working rapidly to acquire land for the Refuge. In pursuit of this objective, on August 19, 2006, the Federal Defendants procured a donation of a one-acre

conservation easement from Defendants James and Annie L. Yount ("the Younts").  On August 23, 2006, FWS filed the easement with Anderson County.

In November 2006, the TWDB incorporated the Fastrill Reservoir in its 50-year state water plan.

**E.     2007.**

In January 2007, the TWDB approved its 2007 State Water Plan, which included the Fastrill Reservoir as a potential major water reservoir for Dallas.  On January 10, 2007, the City filed this lawsuit in the United States District Court for the Northern District of Texas.  That same day, the State filed a lawsuit in the United States District Court for the Eastern District of Texas.  That case was transferred to the United States District Court for the Northern District of Texas and was consolidated with the City's lawsuit.  Both cases are now before the Court in this action.

**III.**

**A.     Partial Motion to Dismiss City of Dallas Complaint.**

1. Count VIII - Violation of NEPA and the APA: Executive Orders 13,132 and 13,352. In its Complaint, the City alleges that the Federal Defendants, by deciding to approve the  Refuge without proper deference to the City's planning and development of the Fastrill Reservoir, interfered with the policy-making discretion of the City in violation of both executive orders, thereby harming the City.  The City further alleges that the Federal Defendants violated the executive orders by failing to consult properly with the City, by deeming the Fastrill Reservoir "speculative," by failing to adequately consider the water supply requirements of the City, by failing  to designate an official to implement the order, and by failing to report to OMB.  (City Compl. ¶¶  125-29.)

The Federal Defendants move to dismiss this claim because both executive orders expressly disclaim creating private rights of action. (Mot. at 8.) The City does not dispute that the executive orders do not provide private causes of action. Rather, the City argues that Fifth Circuit precedent requires that agencies satisfy the substantive terms of executive orders as part of their NEPA compliance and cites *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006)

In *Coliseum Square*, the executive order at issue instructed agencies to consider the "environmental justice impacts of their actions," but did not provide for a private cause of action. *See Coliseum Square*, 465 F.3d at 232. The Fifth Circuit analyzed the agency's environmental justice study as part of its NEPA analysis because the study was submitted as part of the administrative record and was challenged as being conducted in an arbitrary and capricious manner. *See Coliseum Square*, 465 F.3d at 232. Thus, *Coliseum Square* stands for the principle that when an agency considers an environmental justice study as part of its NEPA analysis and consequently, submits that study as part of the administrative record, that study is subject to arbitrary and capricious review under the APA. *See also Communities Against Runway Expansion, Inc. (CARE) v. FAA*, 355 F.3d 678, 688 (D.C. Cir. 2004) (cited in *Coliseum Square*, 465 F.3d at 232).

In this case, neither party has identified any evidence in the Record indicating that FWS considered, discussed or analyzed the mandates of the executive orders as part of its NEPA analysis. Because FWS's consideration of the executive orders (or lack thereof) does not appear to have been part of its NEPA analysis, it is not subject to the Court's review under the APA. Therefore, the Court

concludes that the City's Eighth Claim for Relief, asserting violation of NEPA and the APA based on non-compliance with Executive Orders 13,132 and 13,352 is hereby DISMISSED with prejudice.

       2.      <u>Counts IX and X - Violation of National Wildlife Refuge System Administration Act ("NWRSAA") and the APA:  Failure to Meet Conservation Purposes of Act</u>.

In Count IX of the City's Complaint, the City argues that the donated one-acre easement is void *ab initio* as contrary to the explicit purposes of the Refuge and the requirements of the National Wildlife Refuge System Administration Act ("NWRSAA") and the APA.  Count X of the City's Complaint asserts that because the Federal Defendants failed to acquire water rights in advance of acquiring property in violation of the NWRSAA, FWS's attempt to establish the Refuge is void.  *See* 16 U.S.C. § 668dd(a)(4)(G).

The Federal Defendants seek dismissal of these claims for three reasons.  First, the Federal Defendants argue that the claims constitute a challenge to FWS's claim of title to the easement, which is governed by the Quiet Title Act.  According to the Federal Defendants, the Quiet Title Act is the exclusive means by which a party may challenge the federal government's claim of title to real property, and therefore this Court is without jurisdiction to review this claim under the NWRSAA and the APA.  Second, the City lacks standing to bring claims under the NWRSAA because its alleged injuries - loss of opportunity to construct a reservoir and disruption to the City's plans for future water resources - do not fall within the "zone of interest" that the NWRSAA is designed to protect.  Third, Count X of the City's Complaint, alleging that FWS violated the NWRSAA by failing to acquire water rights in advance of acquiring the easement, should be dismissed because the statute does not include such a requirement.

a. *The Quiet Title Act.*

Like the APA, the Quiet Title Act ("AQTA") contains a limited waiver of sovereign immunity. The QTA allows the United States to be "named as a party defendant in a civil action . . . to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). The Quiet Title Act does not "apply to trust or restricted Indian lands." *Id.*

The Federal Defendants argue that the City cannot avoid the QTA and its restrictions by asserting that the easement is invalid under the NWSRAA because the QTA provides the exclusive waiver of sovereign immunity to challenge the United States' title to real property and remains the exclusive means for challenging ownership regardless of whether Plaintiffs are seeking title for themselves or are seeking to contest the United States' title for other purposes. (Mot. at 12-13 (citing *Block v. North Dakota*, 461 U.S. 273, 286 (1983)).) The Federal Defendants also maintain that the City is barred from bringing its claim under the APA because the APA does not confer authority to grant relief if another statute that grants consent to suit forbids the relief that is sought. (Mot. at 13 (citing 5 U.S.C. § 702(2)).) Finally, the Federal Defendants argue that even if the City had pled a claim under the QTA, that claim would fail for several reasons.[5] (Mot. at 13-14.)

The City maintains that the QTA is inapplicable to its claims because it is not challenging FWS's claim of title to the easement, but rather is challenging the agency's decision to acquire the land in the first place, which is governed by the APA.

First, the plain language of the QTA indicates that its drafters did not intend for it to be applied to this type of case. The QTA explicitly states that it applies to civil actions involving "a

---

[5]      The Federal Defendants argue that the City's claims are barred under the Quiet Title Act because the City has not alleged jurisdiction under the QTA, because it could not properly assert a claim even if it did, and because the City cannot be granted the relief it seeks (divesting the United States of title) under the QTA. (Mot. at 12.)

disputed title to real property." *See* 28 U.S.C. § 2409a(a).  In this case, the City is not asserting a property interest in the land and is not seeking to adjudicate a disputed title to real property. Additionally, the statute requires plaintiffs invoking the QTA to plead with particularity the details of their interest in the property, yet the City possesses no legally recognizable property interest in the easement and therefore, cannot comply with this requirement.

Second, the Federal Defendants' reliance on *Neighbors for Rational Development, Inc. v. Norton*,  379 F.3d 956 (10th Cir.  2004) is misplaced.  In *Neighbors*, the court applied the QTA's Indian trust land exemption disallowing the waiver of immunity and barring the plaintiffs from suing the  government under the APA.  However, this case does not fall within the Indian trust exemption. The  policies, rules, regulations and cases governing applicability of the Indian trust exemption are largely  irrelevant to these facts.  In this case, there is no doubt sovereign immunity will be waived because no  exemption applies.  Thus, the question remains whether the QTA or the APA governs this case.[6]

The QTA applies when there is a disputed title to real property in which the United States claims an interest.  28 U.S.C. § 2409a(a).  The Court disagrees with the Federal Defendant's characterization of this case as one involving "a direct challenge to the FWS's claim of title to an interest in real property."  (Reply at 3.)  Rather, the language of the Complaint and the facts as described indicate that the City is seeking judicial review of the agency's decision to acquire the land. Furthermore, an easement is a non-possessory interest that authorizes its holder to use real property

---

[6]

  The Federal Government repeatedly cites *Block v. North Dakota*, 461 U.S. 273 (1983) in support of its arguments.  *Block* stands for the principle that Congress intended the QTA to provide the exclusive means by which adverse claimants can challenge the United States' title to real property.  There is no mention in *Block* of the APA and the facts therein are not analogous to the facts of this case.

for a particular purpose; it is not a property interest to which title can be had. *See Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697, 700 (Tex. 2002).

Therefore, because the City is not challenging the federal government's title, and because the City does not possess the type of property interest necessary for maintenance of a quiet title action, the Court concludes that 28 U.S.C. § 2409a is inapplicable to Counts IX and X. *See, e.g., City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465, 471-72 (D.C.D.C. 1978); *State of South Dakota v. United States Dep't of Interior*, 69 F.3d 878, 890-91 (8th Cir. 1995) (dissent).

      b. *Standing Under the NWRSAA.*

The Federal Defendants argue that the City's APA claims should be dismissed because the City's alleged injuries - loss of potential opportunity to construct a reservoir and disruption to the City's plans for future water sources - do not fall within the "zone of interests" that the National Wildlife Refuge System Administration Act is designed to protect. (Mot. at 15.)

In addition to satisfying the Article III requirements for standing, a plaintiff challenging an administrative agency's decision must also show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Nat'l Athletic Trainers Ass'n, Inc. v. U.S. Dep't. of Health and Human Svcs.*, 455 F.3d 500, 503 (5th Cir. 2006). "In deciding whether a litigant has prudential standing, we must identify what interest the litigant seeks to assert and then decide if that interest is arguably within the zone of interests to be protected or regulated by the statute." *Bonds v. Tandy*, 457 F.3d 409, 414 (5th Cir. 2006). Under the 'zone of interests' test, courts liberally construe Congressional acts to favor a plaintiff's standing to challenge administrative actions, yet not all plaintiffs affected by a regulation or order have standing to sue." *See id.* In cases where the plaintiff

15

is not the subject of the regulatory action, the zone of interests test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit suit. *See id.*

"The mission of the [National Wildlife Refuge] System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of past and future generations of Americans." 16 U.S.C. § 668dd(a)(2). In its Complaint, the City itself identifies the policy of the NWSRAA as ensuring that "each refuge shall be managed to fulfill the mission of the [National Wildlife Refuge] System, as well as the specific purposes for which that refuge was established." (City Compl. ¶ 57.)

The Federal Defendants argue that whereas the NWRSAA is designed to ensure that there is a national network of lands and waters for conservation and recreational use, the City's interests are in protecting its opportunity to construct a reservoir for future municipal water needs. Thus, because the City's alleged injury - the loss of an opportunity to construct a reservoir - does not fall within the zone of interests to be protected by the statute, the City lacks prudential standing and therefore its claims under the NWSRAA must be dismissed.

The City responds by arguing that it has standing because (1) the City of Dallas has *quasi-*sovereign status for this public health and welfare issue and (2) the City of Dallas is a competitor for the land.

(i) <u>Quasi-sovereign Status</u>.

The City argues that it hold a special position and interestthat entitles it to standing because it is a city, not an individual. In support of this argument, the City cites *Massachusetts v. EPA*, 127

S. Ct. 1438, 1454-55 (2007). However, *Massachusetts v. EPA* is inapposite to this case because it involves Article III standing, not prudential standing. Therefore, the Court is unwilling to extend its reasoning to these facts.

(ii) <u>Competitor Status</u>.

The City also argues that it has prudential standing as FWS's competitor for use of the same area. The City cites *National Credit Union* for the principle that the "zone of interest" test is "sufficiently broad to embrace the interests of an actual or potential competitor." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998). The zone-of-interest test was first articulated in *Data Processing Service Organization, Inc. v. Camp* and was reinforced in several subsequent cases - all finding that competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions. 397 U.S. 150 (1970); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45 (1970); *Inv. Co. Inst. v. Camp*, 401 U.S. 617 (1971); *Clark v. Secs. Indus. Ass'n*, 479 U.S. 388 (1987); *Nat'l Credit Union Admin. v. First Family Bank & Trust Co.*, 522 U.S. 479 (1998).

This case differs from *Data Processing* and its progeny in many ways. First, unlike those cases, this case does not involve a challenge by the plaintiff to FWS's interpretation of a statute. Moreover, even if it did, the purpose of the statute at issue is to ensure that each refuge be managed to fulfill the mission of the National Wildlife Refuge System. The mission of the system is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). There is nothing in the statute or the City's briefing to indicate that this statute is designed to protect

the City's interest in constructing a reservoir on this land. Moreover, *Data Processing* and its progeny involve statutes that affect economic competition. This statute does not have any effect on competition and the facts of this case do not involve economic competition. That the City and the Federal Defendants are "competing" for the same land is something altogether different. The City's competing interest in using the land for water is not arguably within the zone of interests to be protected by the statute. Therefore, the City's interest is outside the zone of interest sought to be protected by the NWSRAA and the City lacks standing to bring Counts IX and X.

       3. <u>Count XI - Violation of the APA - Agency Abuse of Discretion</u>.

       Count XI of the City's Complaint alleges a violation of the APA based on FWS abusing its discretion in several areas. The City alleges that the Federal Defendants engaged in several acts that, either individually or collectively, give rise to a cause of action under the APA. In its response brief, the City characterizes this claim as alleging that FWS violated the APA by accepting a one-acre conservation easement in bad faith. (City Resp. at 19.)

       The Federal Defendants move to dismiss this claim because APA review cannot be conducted independent of another statute. The City responds by conceding that § 702 does not, by itself, confer subject matter jurisdiction. Instead, the City argues that jurisdiction exists pursuant to § 1331 and cites *Stockman v. Federal Election Comm'n,* 138 F.3d 144, 151 (5th Cir. 1998) in support of its position.

       In *Stockman*, the Fifth Circuit noted that § 702 of the APA creates a cause of action for "[a] person suffering legal wrong because of agency action, or adversely affectedor aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "The relevant statute, of course, is the statute whose violation is the gravamen of the complaint." *Stockman,* 138 F.3d at

151.  In other words, "there is no right to seek judicial review under the Administrative Procedure Act in the absence of a relevant statute whose violation forms the legal basis of the complaint against the governmental action." C. Wright & A. Miller, 14A Federal Practice & Procedure § 3659 (2007).

In Count XI, the City did not identify a statute that forms the basis of its APA claim. The City's claim is entitled "Violation of the APA - Agency Abuse of Discretion" and alleges that "[t]he federal Defendants' bad faith acceptance of the donation of this one-acre conservation easement is evidence that they acted arbitrarily and capriciously, and abused their discretion, in violation of the APA, 5 U.S.C. § 706(2)(A), and therefore the transfer of the one-acre conservation easement to FWS should be rescinded and the property returned to the Younts." (City Compl. ¶ 153.) The City's attempt in its briefing to provide "substantive and procedural standards" to support its APA claim belies the allegations in the Complaint. (Resp. at 20-22.) There is no mention in Count XI of the Complaint of an underlying statutory violation and therefore, the City is not entitled to judicial review of Count XI.

4.  Count XII - Violation of the Tenth Amendment:
Absence of Authority Under the Commerce Clause.

In Count XII of the Complaint, the City alleges that by moving to establish the Refuge, the Federal Defendants violated the City's freedom to provide for its future water needs and violated the City's constitutional right to secure a sufficient water supply for its residents, in violation of the Tenth Amendment and the City's right to sovereignty. (City Compl. ¶¶ 155-64.) The City also asserts that because the Commerce Clause does not allow Congress to regulate in instances where there are no significant impacts on interstate commerce, the statutes at issue allowing for acquisition of the property and establishment of the Refuge should be deemed unconstitutional. (City Compl. ¶ 160.)

In response, the City refines its claim by asserting that the basis therefor is that FWS exceeded its authority when it acquired the easement in order to prevent the construction of the reservoir. (Resp. at 23-24.) The City argues that the Federal Government's actions did not serve a legitimate public purpose because FWS accepted the easement in order to commandeer the City's water planning resources and to prevent construction of the reservoir. (Resp. at 23.) The City also argues that FWS's acceptance of the easement violates the Tenth Amendment by abrogating the City's sovereign power over its water rights. (Resp. at 24.)

First, the Court points out that the City's alleged basis for its Tenth Amendment claim, as argued in its brief, differs considerably from the allegations pled in the Complaint. For instance, the claim presented in the Complaint is based on the Federal Defendants' alleged violation of the City's municipal "right" to secure water for future residents, which is a spurious argument without legal basis. (City Compl. ¶ 161.) Yet the City does not argue in its briefing that it has a legally cognizable Tenth Amendment right to secure a water supply for future residents. Likewise, the Complaint asserts that the statutes allowing for acquisition of the property and establishment of the Refuge should be deemed unconstitutional because they do not have a sufficiently significant impact on interstate commerce. (City Compl. ¶ 160.) However, in its briefing, the City maintains that it "does not question the constitutionality of FWS's authority to acquire lands or establish refuges under the NWRSAA." (Resp. at 23.) Rather, it argues that FWS exceeded its authority when it established the Refuge and accepted the one-acre easement in order to prevent construction of the Fastrill Reservoir.

Factual allegations in a brief are not to be considered on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *See Shapiro, Lifschitz, & Schram, P.C. v. R.E. Hazard,*

*Jr.*, 24 F. Supp.2d 66, 73 (D.D.C. 1998); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1347 (S.D. Cal.1998) (considering face of complaint, documents referred to by complaint, and matters subject to judicial notice; not considering facts presented in briefs, affidavits, or discovery materials); *Town of Ogden Dunes v. Bethlehem Steel Corp.*, 996 F. Supp. 850, 855 (N.D. Ind.1998) (complaint cannot be amended by briefs filed by plaintiff in opposition to motion to dismiss). Therefore, the Court cannot accept the City's pronouncement in its brief that its Tenth Amendment claim is based on the theory that FWS's decisions to establish the Refuge and accept the easement were unlawful because they were made with the purpose of thwarting the plans for the Fastrill Reservoir. Furthermore, the City does not provide any authority to support the Complaint's assertion that the Federal Defendants violated the City's so-called "right" to secure a water supply for future residents. (*See* City Compl. ¶ 161.) Likewise, the City concedes it cannot challenge the constitutionality of the statutes allowing for acquisition of the property and establishment of the Refuge. (City Compl. ¶ 160; Reply at 23.)

For these reasons, the Court hereby DISMISSES Count XII of the City's Complaint.

**B.      Partial Motion to Dismiss State of Texas Complaint.**

<u>1.  Sixth Claim for Relief - Violation of Executive Order</u>.

Like its counterpart in the City's Complaint, the State has asserted a claim against the Federal Defendants for violating Section 3(a) of Executive Order 13,132. The Federal Defendants move to dismiss this claim because the executive order expressly disclaims creating a private right of action. (Mot. at 7.) The State does not dispute that Executive Order 13,132 does not provide for a private cause of action. Rather, it argues that Fifth Circuit precedent requires that agencies satisfy the

substantive terms of executive orders as part of their NEPA compliance and cites *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006).

In *Coliseum Square*, the executive order at issue instructed agencies to consider the "environmental justice impacts of their actions," but did not provide for a private cause of action. *Coliseum Square*, 465 F.3d at 232. The Fifth Circuit analyzed the agency's environmental justice study as part of its NEPA analysis because the study was submitted as part of the administrative record and was challenged as being conducted in an arbitrary and capricious manner. *SeeColiseum Square*, 465 F.3d at 232. Thus, *Coliseum Square* stands for the principle that when an agency considers an environmental justice study as part of its NEPA analysis and consequently, submits that study as part of the administrative record, that study is subject to arbitrary and capricious review under the APA. *See also Communities Against Runway Expansion, Inc. (CARE) v. FAA*, 355 F.3d 678, 688 (D.C. Cir. 2004) (cited in *Coliseum Square*, 465 F.3d at 232).

In this case, neither party has identified any evidence in the Record indicating that FWS considered, discussed, or analyzed the mandates of the executive order as it applies to these circumstances. Because FWS's consideration of the executive order (or lack thereof) does not appear to have been part of its NEPA analysis, it is not subject to the Court's review under the APA. Therefore, the Court concludes that the State's Sixth Claim for Relief, asserting violation of NEPA and the APA based on non-compliance with Executive Order 13,132 is hereby DISMISSED.

2. <u>Seventh Claim for Relief - Invalid Conservation Easement</u>.

In the State's Seventh Claim for Relief, the State asserts a stand-alone state law claim under the Texas Conservation Easement Act seeking invalidation of the easement because it does not meet

the definition of "conservation easement" as defined by Section 183.001 of the Texas Natural Resources Code.

A conservation easement is created when a private landowner maintains ownership of the land, but voluntarily conveys a nonpossessory interest in the land to an organization to help preserve the land's conservational uses. *See* Tex. Nat. Res. Code Ann. § 183.001(1). Using a conservation easement, a landowner can designate protection of the "natural, scenic, or open-space values of real property" or assure its availability for agricultural, forest, recreational, or open-space use, protect natural resources, maintain or enhancing air or water quality, or preserve the historical, architectural, archaeological, or cultural aspects of real property. *See id.* § 38.001(1).

The Texas act provides that "an action affecting a conservation easement may be brought by: (1) an owner of an interest in the real property burdened by the easement; (2) a holder of the easement; (3) a person having a third-party right of enforcement; or (4) a person authorized by other law." *Id.* § 183.003(3). Therefore, a landowner subject to a conservation easement may challenge an easement holder either for termination of the easement or to enforce the holder's responsibilities. Also, an easement holder may sue either to enjoin the landowner from conducting activities the holder believes violate the easement or to enforce the landowner's affirmative obligations. The statute also allows third-parties to bring suit to enforce the terms of the easement when the conservation easement provides for such a right.

a. *The Quiet Title Act.*

The Federal Defendants argue that the State's claim is a direct challenge to FWS's claim of title to an interest in real property and may only be brought under the QTA. The Federal Defendants maintain that the QTA provides the exclusivewaiver of sovereign immunity to challenge the United

States' title to real property and remains the exclusive means for challenging ownership regardless of whether the plaintiffs are seeking title for themselves or are seeking to contest the United States' title for other purposes. The Federal Defendants also argue that even if the State had pled a claim under the QTA, that claim would fail for several reasons.[7] (Mot. at 12.)

The State maintains that the QTA is inapplicable to its claim because it is not challenging FWS's claim of title to the easement, but rather is challenging the validity of the easement under statutory and common law. (State Compl. ¶¶ 75-88.) The State also points out that this case does not implicate the Indian lands exception. (Resp. at 14-15.)

For the reasons stated *supra*, the Court hereby finds that this case is not governed by the QTA. Because the State does not possess the type of property right necessary for the maintenance of a quiet title action, the Court concludes that 28 U.S.C. § 2409a is inapplicable to this suit.

b. *Standing.*

The Federal Defendants argue that the State's claim is barred because the State does not have standing under the Texas Conservation Easement Act to assert its claim. (Mot. at 12-13 (citing Tex. Nat. Res. Code Ann. § 183.003).) The Federal Defendants contend that because the State is not an owner of an interest in the property burdened by the easement, a holder of the easement, a person having a third-party right of enforcement, or a person authorized by some other law, it lacks standing to sue under the Act. The State responds by maintaining that it is bringing this action as "a person

_____

[7]
       The Federal Defendants argue that the State's claims are barred under the Quiet Title Act because the State has not alleged jurisdiction under the QTA, because it could not properly assert a claim even if it did, and because the City cannot be granted the relief it seeks (divesting the United States of title) under the QTA. (State Mot. at 11.)

authorized by some other law," and identifies the APA as the "other law" that authorizes it to bring the suit. (State Resp. at 20.)

The Texas Conservation Easement Statute affords standing to those with an interest in a conservation easement or in the property burdened by a conservation easement. Under this statute, property owners may challenge easement holders for (1) termination of the easement due to the holder's non-compliance with the statutory requirements or (2) enforcement of the holder's responsibilities to protect and preserve the property.

In this case the State, which has neither an interest in the conservation easement nor in the property burdened by the easement, seeks termination of the conservation easement so it can use the land for its own use - a use other than that for which the easement was intended. The State seeks to invalidate the easement so the land can be used for a water reservoir instead of a wildlife refuge. Rather than using the statute to promote preservation of the land for conservation purposes, the State seeks to use the statute to abolish the easement's requirements so it may use the land for its own purpose. However the statute is intended to provide a vehicle for the easement grantors (*i.e.* the Younts) and holders (*i.e.* the Federal Defendants) to bring an action against one another for failing to use the land in accordance with the statute and the terms of the easement. The State has not provided any legal authority to support its argument that the APA would give it standing to enforce the terms of the statute or the easement for the purpose of protecting the land for a water reservoir.

The Court concludes that the State lacks standing to bring this claim under the Texas Conservation Easement Act and therefore, the State's Seventh Claim for Relief is hereby DISMISSED.

# IV.

On April 12, 2007, Defendants James and Annie Yount (the "Younts" ) filed their motion to dismiss the City's Complaint for failure to state a claim.[8]  In its briefing, the City argues superficially that its "claims against the Younts" should not be dismissed because the City should first be allowed to offer evidence to prove its claims.

After reviewing the City's Complaint, the Court finds it somewhat difficult to ascertain the precise nature of the cause of action alleged against the Younts.  None of the causes of action are asserted explicitly against the Younts.  Count XI of the City's Complaint, entitled "Violation of the APA - Agency Abuse of Discretion," makes a vague reference to the Younts when it states that "On information and belief, FWS conspired with the Younts to procure the transfer of the one-acre conservation easement in an attempt to prevent any challenge to its attempts to create a refuge and in  order to prevent the City or State from constructing a reservoir in this same general area."  (City Compl. ¶ 151.)  This could be interpreted as asserting a claim against the Younts for conspiring to transfer the conservation easement to prevent a legal challenge to FWS's attempt to establish the Refuge and to prevent construction of the Fastrill Reservoir.  (City Compl. ¶ 151.)  None of the other eleven counts mention or apply to the Younts.

First, Count XI of the City's Complaint has been dismissed against the Federal Defendants because the City did not identify a statute that forms the basis of this APA claim.  Therefore, the  City has no actionable claim against the Younts for "conspiring" with the Federal Defendants on this claim.  Second, because civil conspiracy is a derivative tort, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at lease one of

---

[8]  The State did not include the Younts as defendants in its lawsuit.

the named defendants liable. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). In this case, the City has not pled any underlying tort upon which a conspiracy could be based.

The City's contention that the Court should not dismiss its claim because discovery will assist it in establishing its claim is backward logic. The City has failed to plead a claim against the Younts. The City may not conduct discovery to prove a claim that has not been pled properly.

The City also explains in its response that it has joined the Younts in this lawsuit because the Younts are a necessary party to the City's request for declaratory relief. The City explains that its claim for declaratory relief contains a request that the Court rescind the easement that was conveyed by the Younts to FWS. The City cites the rule of law that no decree can be entered that affects title to property unless all persons who are interested in the title and who may be affected by the judgment are properly before the Court. *See Silvas v. Remington Oil and Gas Corp.*, No. 04-60068, 2004 WL 2095628, at *1 (5th Cir. Sept. 21, 2004). Therefore, the City concludes that the Younts should not be dismissed from this lawsuit because, as a party with an interest in the property that would be affected by the Court's ruling, they are a necessary party to the action.

The Younts respond, without citing any authority, that they are not indispensable parties and their joinder is not necessary to afford the relief the City must prove it is entitled to. They note that the State did not join the Younts in its lawsuit, despite seeking the same relief, because rescission can be obtained and disposition of this action accomplished without the Younts as parties. The Younts assert they will "certainly abide by, and be bound by, any judicial pronouncement by this Court ordering the FWS to rescind the conservation easement." (Mot. at 8.)

The claims that would arguably entitle the City to rescission of the one-acre conservation easement are Counts X, XI, and XII, all of which have been dismissed herein. Therefore, the Younts are not an indispensible to this action and the Younts' Motion to Dismiss is hereby GRANTED.

The City has indicated that it intends to amend Count XI of its Complaint to add the allegation that FWS failed to comply with its own policies by failing to obtain secretary approval of the easement, thereby rendering the deed invalid and demonstrating no refuge has beenestablished. The City has ten (10) days from the date of this order to file a newly amended complaint with this new allegation/claim.

## V.

Therefore, for the reasons stated herein, the Court hereby GRANTS the Federal Defendants' Motion to Dismiss Plaintiff City of Dallas' Eighth, Ninth, Tenth, Eleventh, and Twelfth Claims for Relief and hereby DISMISSES with Prejudice Counts VIII, IX, X and XII of the City of Dallas's Complaint. Count XI is dismissed subject to the City filing an amended complaint within ten (10) days from the date of this order. Further, the Court hereby GRANTS the Federal Defendants' Motion to Dismiss Plaintiff Texas Water Development Board's Sixth and Seventh Claims for Relief and hereby DISMISSES with Prejudice Counts Six and Seven of the State's Complaint. The Court also GRANTS the Younts' Motion to Dismiss.

It is SO ORDERED, this 24th day of October 2007.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE