IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| H. DALE HALL et al., | § | CIVIL ACTION NO. |
| | § | |
| Defendants. | § | 3:07-CV-0060-P |
| | § | |
| ————————————————— | § | |
| | § | Consolidated with: |
| THE TEXAS WATER | § | |
| DEVELOPMENT BOARD, | § | |
| | § | CIVIL ACTION NO. |
| | § | 3:07-CV-0213-P |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| THE UNITED STATES DEPARTMENT | § | |
| OF THE INTERIOR et al., | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Now before the Court are (1) the City of Dallas's Motion for Partial Summary Judgment,

filed January 15, 2008; (2) the Federal Defendants' Cross-Motion for Partial Summary Judgment

Concerning City of Dallas's NEPA Claims, filed February 15, 2008; (3) Plaintiff Texas Water

Development Board's Motion for Partial Summary Judgment, filed January 15, 2008; (4) the Federal

Defendants' Cross-Motion for Partial Summary Judgment Concerning the Texas Water

Development Board's NEPA Claims, filed February 15, 2008; (5) the Federal Defendants' Motion

to Strike Plaintiffs' Extra-Record Materials, filed February 15, 2008; (6) the Texas Conservation Alliance's Motion for Leave to File Amicus Brief, filed February 15, 2008; (7) Friends of the Neches River's and Houston Audubon Society's Motion for Leave to File a Letter in Support of Texas Conservation Alliance's Amicus Brief, filed March 7, 2008; (8) Texas Water Conservation Association's Motion for Leave to File Amicus Brief in Support of Plaintiffs' Motions for Partial Summary Judgment, filed April 7, 2008.

## **DISCUSSION**

The City of Dallas (the "City") and the Texas Water Development Board (the "TWDB" or the "State")[1] (collectively, "Plaintiffs") have filed these consolidated lawsuits against the Federal Defendants[2] ("Defendants")seeking reversal of the United States Fish and Wildlife Service's ("FWS") decision to establish the Neches River National Wildlife Refuge ("Refuge") without preparing an Environmental Impact Statement or an adequate Environmental Assessment as required by the National Environmental Policy Act.

On June 11, 2006, FWS designated a 25,281-acre site within Anderson and Cherokee Counties, Texas as the Neches River National Wildlife Refuge. Plaintiffs want to use the same land on the Upper Neches River for development of a reservoir to serve the future water needs of Dallas residents and other customers. This proposed reservoir is known as the Fastrill Reservoir ("Reservoir"). Defendants' decision to establish the Refuge on this land prompted Plaintiffs to take

---

[1] The TWDB is responsible for administering a comprehensive statewide planning process intended to develop, manage, and conserve the water resources of the State of Texas. *See* Tex. Water Code § 16.051(a) (Vernon 2007). The State of Texas's regional planning groups report to the TWDB. The City of Dallas is Region C.

[2] The Federal Defendants include Defendant H. Dale Hall, in his official capacity as Director of the United States Fish and Wildlife Service; Dick Kempthorne, in his official capacity as the Secretary of the United States Department of the Interior; Benjamin N. Tuggle, in his official capacity as the Regional Director of the Southwest Region (Region 2) of the United States Fish and Wildlife Service; and the United States Department of the Interior.

legal action.  Plaintiffs allege that FWS's administrative decision to establish the Refuge was plagued with procedural flaws and statutory violations.

A.    **National Environmental Policy Act.**

The National Environmental Policy Act of 1969 ("NEPA") was established to ensure that federal agencies carefully consider the environmental impacts of their projects and make information about those impacts available to the public.  *See* 42 U.S.C. §§ 4321-70(d) (1982); *Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003).  NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  NEPA does not mandate particular results.  It imposes procedural requirements on federal agencies by requiring them to take a "hard look" at the environmental impact of their actions.  *Sabine River Authority v. U.S. Dept of Interior*, 951 F.2d 669, 676 (5th Cir. 1992); *see also Coliseum Square Ass'n., Inc.  v.  Jackson*, 465 F.3d 215, 223 (5th Cir. 2006).

NEPA requires a federal agency undertaking an action to determine whether its proposal requires an EIS.  To make this determination, an agency must first prepare a more limited Environmental Assessment ("EA"), which is a concise public document that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS.  *See* 40 C.F.R. §§ 1501.4(b), 1508.9(a).  If the agency determines based on the EA that no EIS is needed because the action would not significantly affect the environment, it must issue a "finding of no significant impact" ("FONSI"), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment.  *See* 40 C.F.R. §§ 1501.4(e), 1508.13.  Otherwise, the agency must prepare an EIS.

Plaintiffs contend that FWS violated its NEPA obligation by failing to prepare an EIS or an adequate EA with respect to its decision to establish the Refuge. First, Plaintiffs contend that Defendants were required to prepare an EIS because the Refuge decision was a "major federal action . . . significantly affecting the quality of the human environment." Second, Plaintiffs contend the EA was inadequate because FWS failed to provide adequate evidence and analysis of the indirect impacts of the Refuge designation and failed to consider alternative refuge sites. Third, Plaintiffs allege that FWS failed to take a "hard look" at the environmental consequences of its decision, as illustrated by its decisions to rely on an obsolete study and ignore current data. Fourth, Plaintiffs accuse FWS of violating NEPA by failing to cooperate with state and local officials.

**B.**     **Standard of Review.**

An aggrieved party challenging an agency's decision that an EIS is not required or challenging the adequacy of an EA may assert its claims in federal court under the Administrative Procedures Act. *See* 5 U.S.C. § 702. The court reviews these agency decisions under the highly deferential "arbitrary and capricious" standard. *See Sabine River,* 951 F.2d at 677-78. When applying this standard, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).

This Court cannot reconsider anew the facts leading to the establishment of the Refuge or weigh the evidence supporting or contradicting FWS's decision. This Court may only evaluate whether FWS's decision had evidentiary support based on the administrative record at the time the it was made. Whether or not the Court would have decided similarly is immaterial, so long as the

agency considered all relevant factors and had evidence supporting its decision. Thus, Plaintiffs'

burden in this case is to show that Defendants had no evidence to support the decision not to produce

an EIS or Defendants disregarded or ignored a factor required in conducting the EA. *See Brenham*

*Cmty. Prot. Ass'n v. U.S. Dep't of Agric.,* 893 F. Supp. 652, 657-58 (W.D. Tex. 1995). This Court

"must look at the decision not as a chemist, biologist, or statistician that [it is] qualified neither by

training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of

holding agencies to certain minimal standards of rationality." *Gulf Restoration*, 452 F.3d at 368

(internal quotation marks omitted).

## C.    Amicus Briefs.

Three organizations move for leave from the Court to present their perspectives on these

issues.

### 1. Texas Conservation Alliance.

The Texas Conservation Alliance, which is a conservation organization that works to protect

native wildlife habitat and address environmental problems, moves for leave to file an amicus brief

which it believes "will bring to this case another perspective, one not shared by the parties to this

case." (Mot. for Leave at 2.) The Court hereby GRANTS the Texas Conservation Alliance's motion

and instructs the Clerk's Office to file its accompanying amicus brief [Docket No. 106-3].

In its amicus brief, the Texas Conservation Alliance reiterates FWS's *Sabine River* arguments

that establishment of the Refuge maintains the status quo and there is no causal relationship between

establishment of the Refuge and risk of water shortage. (*See infra*.) The brief goes on to describe

the value of the Refuge as a habitat for wildlife, for public recreation, and for preserving the

environment. The brief also gives chronological descriptions of the Refuge planning and the Reservoir planning.

**2. Friends of the Neches River and Houston Audobon Society's Motion for Leave to File a Letter in Support of Texas Conservation Alliance's Amicus Brief.**

Friends of the Neches River is a conservation organization that was formed for the specific purpose of protecting the Neches River and its bottomland forests. Houston Audobon Society is a non-profit organization that promotes the conservation and appreciation of bird and wildlife habitats. Both organizations support establishment of the Refuge and formally move to file a letter expressing their support of the Texas Conservation Alliance's brief and adopting its amicus brief as their own. The Court hereby GRANTS the motion and instructs the Clerk's Office to file their accompanying letter of support [Docket No. 111-2].

**3. Texas Water Conservation Association's Motion for Leave to File Amicus Brief in Support of Plaintiffs' Motions for Partial Summary Judgment.**

The Texas Water Conservation Association ("TWCA") is a statewide association of governmental and private entities that are active and interested in long-term provision of safe and adequate water resources. TWCA maintains that its amicus brief will provide another viewpoint not represented by the parties in this case. The Court hereby GRANTS the Texas Water Conservation Association's motion and instructs the Clerk's Office to file its accompanying amicus brief [Docket No. 123-2].

In its amicus brief, the TWCA maintains that the Administrative Record ("Record") reveals that the NEPA process conducted by FWS was cynically manipulated and unobjective. Despite its assurance that "the purpose of [its] amicus brief is not to repeat, rehash, or oppose the precise legal arguments made by the parties," the amicus brief goes on to reiterate the arguments made by

Plaintiffs: (1) that FWS failed to take a hard look at the environmental consequences of its action; (2) that FWS was biased and manipulative in conducting its NEPA analysis; and (3) that FWS did not adequately consider alternatives. The amicus brief also includes a chronological timeline of events. (Amicus Br. at 3-7.)

**D.**    **Failure to Prepare an Environmental Impact Statement (EIS).**

Both Plaintiffs and Defendants move for summary judgment on the issue of whether FWS was required to prepare an EIS in this case. The City argues that (1) FWS's own guidelines mandate preparation of an EIS; (2) the Department of Interior manual requires FWS to prepare an EIS; and (3) NEPA requires preparation of an EIS because the Refuge may have significant effects on the environment. The State argues that (1) establishment of the Refuge was a "major federal action" and (2) establishment of the Refuge would have significant regional socio-economic effects and significant indirect effects. Defendants argue that the Fifth Circuit's decision in *Sabine River Authority v. United States Department of the Interior*, 951 F.2d 669 (5th Cir. 1992) governs this case and mandates a ruling in their favor.

**1.    The *Sabine River* Case.**

In *Sabine River* — a case strikingly similar to this one — the Fifth Circuit held that FWS was not required to prepare an EIS with regard to its decision to accept a conservation easement on 3800 acres of land in East Texas even though acquisition of the easement prevented the plaintiff from constructing a water reservoir on the same land. Like this case, *Sabine River* involved an effort by FWS to preserve land for the sake of protecting wildlife habitats and populations. Like this case, the agency action in *Sabine River* foreclosed the plaintiff from establishing a reservoir on the same land. Like this case, the *Sabine River* plaintiff had "given serious consideration to using [the] land to

7

construct" a reservoir. *Id.* at 673. Like this case, the *Sabine River* plaintiff's "plans for the construction of the reservoir, aimed at satisfying the anticipated need for additional water over the next forty years [in our case, 50 years], were still in the preliminary stages: [it] had obtained none of the necessary federal and state permits, had secured no funding, and had not yet entered into any firm contracts for the" water that the reservoir would generate each year. *Id.* Like this case, the *Sabine River* plaintiff filed suit in federal court, alleging that the federal agency's decision interfered with the plaintiff's long-term plan to construct a reservoir, which would ensure that the state's water supply would not be placed in jeopardy in the calendar year 2030 (in this case, 2060 [TWDB 562]). And like this case, the *Sabine River* plaintiff invoked NEPA and argued that FWS's action constituted a "major federal action significantly affecting the quality of the human environment," thereby necessitating preparation of an EIS. *Id.*

Defendants argue that *Sabine River* controls the outcome of this case by presuming this case is indistinguishable from it. Defendants maintain that Plaintiffs' arguments seeking to distinguish this case from *Sabine River* are foreclosed by *Sabine River* which controls the outcome of this case. (Defs.' Cross-Mot. for Summ. J. on State NEPA Claims at 16.) As the State points out, this argument is circular: it assumes that *Sabine River* is not distinguishable, then uses that precedent to foreclose the argument that it is distinguishable. (State Resp. at 3.)

*Sabine River* requires the Court to conduct an analysis of the facts of each particular case, as governed by the law set forth therein. In order for the Court to determine whether the agency action at issue rises to the level of a major federal action significantly affecting the quality of the human environment under *Sabine River*, the Court may look at whether the agency action at issue (1) precludes any development of the land, (2) changes the character or function of the land, and (3)

prohibits any change in the status quo of the land. *See Sabine River*, 951 F.2d at 680. To do this, the Court must decipher from the Administrative Record the scope of the agency action taken and whether the agency action causes a significant change to the land. The Court must also analyze the socio-economic impact of the Refuge decision on the Reservoir and on regional and state water planning generally, and whether the indirect effects of the Refuge are significant within the meaning of NEPA. *See id.*

### a. Direct Effect on Physical Environment.

In *Sabine River* the district and circuit courts held that FWS's act of acquiring the easement "'d[id] not alter the environmental status quo; it does not cause any change in the physical environment. Indeed, the purpose of the [action] [wa]s to foreclose *any* change in the physical environment of a particular wetland site.'" *Sabine River*, 951 F.2d at 679 (quoting *Sabine River,* 745 F. Supp. 388, 394 (E.D. Tex. 1990).). The courts also held there was no causal connection between the federal agency action and the alleged change to the physical environment. *See Sabine River*, 745 F. Supp. at 394-95; *Sabine River*, 951 F.2d at 680. The Fifth Circuit noted that NEPA does not require a federal agency to prepare an EIS in order to "leave nature alone." *Sabine River*, 951 F.2d at 679. "NEPA may require an EIS whenever a reservoir is built, but NEPA does not require preparation of an EIS whenever a reservoir is not built." *Id.* The court reasoned that the agency action "did not effectuate *any* change to the environment which would otherwise trigger the need to prepare an EIS." *Id.* The court concluded that an agency action that "precludes any development of the land whatsoever," that does not "change [ ] the character or function of the land," and that "by its terms prohibits any change in the status quo" does not amount to a "'major Federal action[]

significantly affecting the quality of the human environment.'" *Id.* at 679-80 (quoting 42 U.S.C. § 4332(2)(C) (alteration in *Sabine River*).

In this case, Defendants characterize the agency action as the "establishment of an acquisition boundary for a refuge," which they argue is analogous to *Sabine River*'s acquisition of the conservation easement because it does not alter the status quo of the land. (Defs.' Mot. for Summ. J. on State NEPA Claims at 18; AR 1963 [FONSI].) The City argues that FWS's action is distinguishable from the *Sabine River* action because the agency action in this case was to establish a refuge and establishment of an actual refuge "'normally require[s] the preparation of an EIS.'" *Sabine River*, 745 F. Supp. at 400 (quoting Dep't of Interior Manual, 516 DM 6, App. 1, 1.3A(1)). This case is arguably distinguishable because the negative easement in *Sabine River* prohibited any change in the physical environment, whereas here the "land use within the [R]efuge boundaries will be in flux." (City Resp. at 2.)[3]

According to the FONSI, FWS's agency action resulted in the "establish[ment] of an [sic] land acquisition boundary." (AR 1963.) It allows for "establishment of the Neches River National Wildlife Refuge" which allows FWS to make land purchases "in fee and easement interests from willing sellers and/or donors, and in coordination with the affected public." (AR 1961.) The "national wildlife refuge will only exist after an interest in land is acquired by the United States within an approved boundary." (AR 1963.) Eventually, FWS will prepare a formal Comprehensive

_____

[3] To support its position that this federal action will result in change to the physical environment, the State points to the EA which states that FWS "would strive to replace introduced loblolly pine or slash pine species with native hardwoods or evergreens." (State Mot. at 17 (citing AR 1194).) This argument lacks merit because this is a management issue, not an establishment issue and management of the Refuge will be addressed comprehensively in the Comprehensive Conservation Plan and in accordance with NEPA. Additionally, these changes will add more of what is sought to be protected — bottomland hardwoods.

Conservation Plan ("CCP") that will provide detail about Refuge management, with input from the public and in accordance with NEPA. (AR 1973-81.)

The fact that this case involves establishment of a 25,281-acre refuge, not a 3800-acre non-development easement is immaterial. The fact that establishment of the Refuge will prevent the land from being sold, subdivided, or cleared and used for a reservoir, pastures, tree farms, oil and gas drilling, natural gas pipelines, and residences does not mean that establishment of the Refuge alters the status quo. (City Mot. at 23-32.) The status quo is the condition of the land as it is now. Establishment of the Refuge will not alter the condition of the land as it is today — in fact, it will effect no change in the status quo. Establishment of the Refuge boundary will not result in a change to the physical environment and in fact, preserves the land at issue.[4]

### b. Indirect Effects on Environment.

Plaintiffs argue that FWS violated NEPA by failing to address the Refuge's indirect effects on Dallas's water supply, the Dallas economy, and Dallas and Texas's future water planning. (City Mot. at 39; State Mot. at 12, 14-15.) Defendants maintain that NEPA does not require FWS to evaluate the Refuge's potential impact on the City's future water supply or water-planning process for two reasons: (1) those impacts would not be the proximate result of the agency action, and (2) they would be too remote and speculative to determine. (Defs.' Resp. to City Mot. at 34.)

---

[4] The City argues this is its "*only* opportunity to challenge FWS's NEPA analysis for establishment of the Refuge" and objects to FWS's explanation that FWS will be required in the future to conduct NEPA analyses in conjunction with environmental impacts that may occur due to management of the Refuge. (City Reply at 6.) The City's objection does not make the City's case for an EIS any more persuasive and is immaterial to the Court's decision.

An agency must review the direct, indirect, and cumulative impacts of the proposed action when deciding whether or not to prepare an EIS.[5]  *See generally* 40 C.F.R. § 1508.9(b).[6]  NEPA does not require an exhaustive, detailed discussion of impacts in an EA.  *See* Joan E. Drake, Paper, *The NEPA Process - What Do We Need To Do and When?*, 2006 Rocky Mountain Mineral Law Found. Paper 3 (2006).  An EA must show the agency considered relevant factors and made a reasoned evaluation.  *See Utah Shared Access Alliance v. U.S. Forest Serv*, 288 F.3d 1205, 1213 (10th Cir. 2002).  NEPA requires agencies to focus on reasonably-foreseeable impacts "rather than distorting the sum process by overemphasizing highly speculative harms."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989).  NEPA requires FWS to take into account those effects that "are *caused* by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 452 (5th Cir. 2005) (internal quotation marks omitted).  "A 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations."  *Id*. (internal quotation marks omitted).  "Rather, a plaintiff mounting a NEPA challenge must establish that an alleged effect will ensue as a 'proximate cause,' in the sense meant by tort law, of the proposed agency action."  *Id.*

*Sabine River* requires a court to evaluate whether the agency action had an indirect adverse impact on the environment, such as on the water supply and planning, the local economy, or the

---

[5]  "Direct effects" are caused by the action and occur at the same time and place.  "Indirect effects" are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable.  "Cumulative impacts" result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.  *See* 40 C.F.R. §§ 1508.8(b), 1508.7.

[6]  40 C.F.R. 1508.9(b) ("[An] Environmental Assessment shall include "*brief* discussions of . . . the environmental impacts of the proposed action." (emphasis added); *id.* § 1508.8 (environmental impacts include direct and indirect effects of the proposed action); *id.* § 1508.27 (inquiry into whether action has "significant" effect must include cumulative impacts).  NEPA uses the terms "effects" and "impacts" interchangeably.  *See* 40 C.F.R. § 1508.8.

population.  *See Sabine River*, 951 F.2d at 680.   In *Sabine River*, the court held that aside from the absence of any change to the physical environment, it doubted whether the adverse impact on water quality and supply could be precisely attributed to FWS's acquisition of the easement.  *See id.*  The court believed any link between acquisition of the easement and adverse impact on water supply was too unpredictable and speculative to be considered a significant environmental impact.  *See id.*

Plaintiffs argue FWS had much more information about the effects of the Reservoir on the City's water supply than it did in *Sabine River*, thereby rendering this Reservoir project non-speculative.  For example, in this case the Fastrill Reservoir was listed as a planned reservoir in two regional water plans, a potential construction date has been set, the facility and unit costs are calculated, and the economic consequences of not adopting the proposed water management strategies have been estimated.   (State Resp. at 4-5.)   Plaintiffs also argue that this case is distinguishable from *Sabine River* because the *Sabine River* reservoir was not listed in the state water plan on which FWS reasonably relied when conducting its EA.  The State argues that because the Fastrill Reservoir was listed as a potential future reservoir site in two state water plans, FWS was aware of the need for the Reservoir and Plaintiffs' plan to construct it.

Though the water plan in *Sabine River* did not list the *Sabine River* reservoir as a planned reservoir, FWS did review the Sabine River Authority's Master Plan which contained its own water supply projections to support the conclusion that the reservoir at issue was necessary.  *See Sabine River*, 745 F. Supp. at 398.  The district court found that FWS "fully considered the available data on future water supply needs" of the relevant region.  *Id.* at 399.  This is analogous to FWS having the two Water Plans and corresponding data on future water supply needs in this case.

Plaintiffs further argue that this case is distinguishable from *Sabine River* because here, Plaintiffs have a projected construction date for the Reservoir and have calculated facility and unit costs. Furthermore, Plaintiffs' assert that the inability to construct the Reservoir will have known and significant impacts on the region's water supply and economy as set forth in the State's 2006 Water Plan for Region C.

The flaw in the Plaintiffs' position is that these adverse effects will not be caused by establishment of the Refuge or Plaintiffs' inability to develop the Fastrill Reservoir. The drought conditions described in the State's 2006 Water for Texas Plan for Region C presume no new water supplies being developed over the next fifty years. (TWDB 280-83.) Plaintiffs do not anticipate building the Reservoir until 2050 or tapping into the Reservoir until 2060 — long after these alleged effects would be felt. (TWDB at 562.) Additionally, there are many other factors that could affect the water supply for the region that FWS cannot control or foresee, for example, the City's and the State's water planning processes, how Plaintiffs choose to address the region's future water supply needs, from where the City purchases its water, whether and to what extent the City adopts water conservation measures, and whether and when the City develops new sources of water. The Fifth Circuit has noted that "it is doubtful that an environmental effect may be considered as proximately caused by [an agency action] if that effect is directly caused by the action of another government entity over which the [agency] has no control." *Shoreacres*, 420 F.3d at 452. Establishment of the Refuge boundaries today cannot be said to be the legal and proximate cause of deficiencies in the City's water supply fifty years from now. While it is reasonably foreseeable that establishment of the Refuge will cause the Reservoir to be thwarted, it is beyond FWS's capability and NEPA's scope to require FWS to identify all possible consequences that could be caused by the Reservoir not being

14

built. The Court finds that the effects of FWS's action upon the City's and the State's water supplies are not within the scope of NEPA and can not form the basis of a NEPA claim.

### 2. Department of Interior Guidelines.

The City argues that an EIS was required pursuant to Department of Interior guidelines, which mandate preparation of an EIS when a new refuge system proposal conflicts with local land use plans. (City Mot. at 4, 20.)

The Department of Interior provides guidelines for FWS to follow when implementing NEPA. *See* NEPA Rev'd Implementing Procedures, 62 Fed. Ref. 2375 (Jan. 16, 1997)). These guidelines "provide general guidance for NEPA compliance" for FWS activities and list those "major actions normally requiring an environmental impact statement." *Id.* at 2376. The guidelines state that, "[m]ajor proposals establishing new refuge systems" "*when determined to be a major Federal action significantly affecting the quality of the human environment*, will normally require the preparation of an EIS." *Id.* at 2382 (emphasis added). What the City fails to mention is that establishment of a refuge requires an EIS only when the action significantly affects the quality of the human environment. Because the City has not demonstrated that establishment of this Refuge will significantly affect the human environment, no EIS was required pursuant to the Department of Interior guidelines.

### 3. FWS Guidelines.

FWS has its own set of guidelines to help its staff determine whether a particular agency action will require preparation of an EIS. (City Mot. App. at 101-06.) FWS advises that certain criteria "*may* trigger the preparation of an EIS," "depending on the severity and duration of [the] effects." (City Mot. App. at 102 (emphasis added).) Despite the discretionary language of the

guidelines, the City alleges that in this case, the guidelines "compel[] the preparation of an EIS." (City Mot. at 18.) Specifically, Plaintiffs argue that because the agency action (1) "expos[es] *existing or future* generations to increased safety or *health hazards*;" (2) *"conflicts* with *substantially proposed or adopted local, regional, State, interstate, or Federal land use plans or policies* that may result in adverse environmental effects;" and/or (3) has "adverse effects on *municipal*, industrial, or agricultural *water supply* or quality; or *major consumptive use* or other *long-term commitment of water,*" FWS was required to conduct an EIS. (City Mot. App. at 102-03.)

The Court is not persuaded by Plaintiffs' arguments. The underpinning of the guidelines is a showing of causation; the agency action must be shown to cause adverse environmental effects. The City has not established that establishment of the Refuge will cause adverse effects to Dallas's future water supply. *See, e.g., Sabine River*, 951 F.2d at 680 ("[t]he inquiry in NEPA cases is whether the federal action at issue is 'proximately related to a *change* in the physical environment.'"). It is too tenuous an argument to say that establishment of the Refuge boundaries will be the proximate cause of hazardous drought conditions or a shortage of water for future Dallasites. The City has not established that the Reservoir at this location is the only water source available to meet Dallas's future needs. Nor has the City established with certainty that the Reservoir would, in fact, be built; the Fastrill Reservoir was not a *substantially proposed or adopted* land use plan — planning was in its infancy — the feasibility study had not yet been finalized and the City had taken no concrete steps to construct the Reservoir, such as official authorization, funding, permitting, design studies or environmental studies. *Cf. Sabine River*, 951 F.2d at 673 (finding reservoir project was still in the preliminary stages when plaintiffs "had obtained none of the necessary federal and state permits, had secured no funding, and had not yet entered into any firm

contracts for the" water that the reservoir would generate each year).[7] Therefore, the Court finds that the FWS guidelines did not mandate preparation of an EIS in this case.

For all these reasons, the Court concludes that FWS did not act arbitrarily and capriciously by deciding not to issue an EIS in this case.

**E.    Adequacy of the Environmental Assessment.**

An EA is a "concise public document" that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI.  *See* 40 C.F.R. §1508.9.  "An EA is 'a rough cut, low-budget environmental impact statement that is designed to show whether a full-fledged environmental impact statement — which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project — is necessary.'" *La. Crawfish Producers Ass'n - W. v. Rowan*, 463 F.3d 352, 356 (5th Cir. 2006) (quoting *Sabine River*, 951 F.2d at 677).

An EA must "include brief discussions of [1] the need for the proposal, [2] alternatives as required by section 102(2)(E), [3] the environmental impacts of the proposed action and alternatives, and [4] a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).

The thirty-eight page EA in this case evaluates the "scope and dimensions of the proposed [refuge] boundary." (AR 1168.)  The EA lists three refuge alternatives: (A) a "no action" alternative, (B) the recommended 25,281-acre configuration, and (C) a smaller and narrower 15,294-acre configuration.  (AR 1174-75.)  The EA acknowledges that the Fastrill Reservoir had been proposed

---

[7]    Plaintiffs' characterization of their "planning" as "distinctly more concrete" than the *Sabine River* reservoir is not supported by the record evidence.  For example, the fact that communication may have been initiated with officials who would be involved in the process of obtaining permits for the reservoir does not mean that the application process had begun or that any permit had been obtained.  In fact, initiation of discussions is a far cry from actual acquisition of permits.  (*See* City Resp. at 5 (citing TWDB0595).)  What the evidence indicates is that virtually no real planning had been done between 1961 and the time FWS announced its decision to establish a refuge on the land. Even preliminary planning was not initiated until 2005 — two years after FWS began taking the necessary steps to establish the Refuge.

for the Neches River and that the City had contracted for a feasibility study on its potential development. (AR 1178.) The EA does not include an alternative that discussed a Refuge/Reservoir combination. The EA explains that FWS "considered the reservoir project speculative in the short term, and not definite in scope and purpose," accordingly, FWS could not "formally evaluate the combined or cumulative impacts or details of how the two projects might interface while not attenuating the mutual goals of each project." (AR 2971; *see also* AR 1185.) In discussing the "no-action" alternative, the EA recognizes that if the Refuge is not established, the Reservoir "could eventually be built." (AR 1190, 1200.) In the other two alternative discussions, the EA notes that establishment of the Refuge would prevent development of the Reservoir. (AR 1194, 1998.)

The City argues that the EA is deficient because FWS failed to (1) assess a reasonable range of alternatives; (2) analyze many of the indirect and cumulative impacts; (3) use current information in its analysis; (4) supplement the EA and FONSI in light of new information and circumstances; (5) consider the economic impacts on the city of Dallas; and (6) coordinate and consult with State and local agencies. FWS maintains it reasonably evaluated each of these issues and appropriately issued a finding of no significant impact.

**1. Consideration of a Reasonable Range of Alternatives.**

NEPA mandates that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EA must include a reasonable range of alternatives, but NEPA does not require an agency to discuss "all proposed alternatives, no matter what their merit." *See La. Crawfish Producers,* 463 F.3d at 356. "'[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed

action becomes less and less substantial.'" *Id.* at 357. "NEPA's requirement with regard to an agency's consideration of alternatives is subject to a rule of reasonableness." *Davis Mountains Trans-Pecos Heritage Ass'n v. U.S. Air Force*, 249 F. Supp. 2d 763, 793 (N.D. Tex. 2003) (Cummings, J.). The rule of reason applies to the range of alternatives considered as well as the extent the EA must discuss each alternative. *Id.* There is no need for an agency to analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective. *See Fuel Safe Wash. v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1323 (10th Cir. 2004) (internal quotation marks omitted) (omission in original). Alternatives that do not accomplish the purpose of an action are not reasonable. *See Davis Mountains.* 249 F. Supp. 2d at 793. Where conflicting evidence is before an agency, the agency and not the court has the discretion to accept or reject from the several sources of evidence. *See Sabine River*, 951 F.2d at 678.

Under the highly deferential standard of review the Court must use, the Court may not substitute its judgment for that of the agency, but must studiously review the record to ensure that the agency has arrived at a reasoned judgment. *See id.* at 676.

### a. The Joint Refuge/Reservoir Alternative.

The City argues that FWS acted arbitrarily and capriciously by refusing to consider an alternative that would include both the Refuge and the Reservoir. FWS responds that it was not required to evaluate a joint Refuge/Reservoir alternative because such an alternative would have been speculative. The EA concludes that because the feasibility study had not yet been done and because the Reservoir project was far beyond the planning horizon for the Refuge proposal, it was too speculative to determine how the two projects might interface. (AR 1185, 1966.)

In *Sabine River*, FWS did consider in its EA the alternative of establishing a refuge in conjunction with the reservoir. *See Sabine River*, 745 F. Supp. at 399. FWS rejected that alternative because it would not prevent destruction of the wetland habitat FWS was trying to preserve. *See id*. FWS also concluded that any area set aside for refuge purposes would be of inferior quality. *See id*. This decision was supported by a Texas Parks and Wildlife report which suggested that wetland sites established in conjunction with reservoir projects are of only marginal value to the waterfowl populations. *See id*.

The Record establishes that Plaintiffs' plans for constructing the Reservoir were aimed at satisfying an anticipated need for additional water in 2060. The Reservoir would not even be constructed until 2050 and planning for its construction was in the preliminary stages. Plaintiffs had not obtained any of the necessary federal and state permits, had secured no funding, and had not yet entered into any firm contracts for the water that the Reservoir would generate each year. The Court concludes that it was not arbitrary and capricious for FWS to conclude that a combined Refuge/Reservoir alternative would be too speculative.

### b. Alternate Refuge Site.

Plaintiffs also maintain that FWS violated NEPA because it did not appropriately consider an alternate site for the Refuge. (City Mot. at 35-37.) In March 2006, FWS was presented with the draft feasibility study which outlined some preliminary alternate sites for the Refuge. (AR. 722-24.) On April 3, 2006, FWS Director Dale Hall met with the City and the Upper Neches Regional Municipal Water Authority ("UNRMWA") in Washington, D.C. to discuss co-existence of the Refuge and the Reservoir. At this meeting, the Reservoir proponents gave a presentation about the Reservoir and the City's water needs and requested that Director Hall not approve the FONSI until

both Parties have an opportunity to work together to identify an alternate refuge site of equal or greater value for preservation of bottomland hardwood habitat. (AR 2077, 2128.) Director Hall agreed to postpone his decision until June 1, 2006. (AR 2067, 2076, 2154, 2210.) In the interim, the parties established a "technical/scientific team" that was comprised of an FWS representative to work with the City, its consultant HDR Engineering, Inc. ("HDR"), the UNRMWA, and the State of Texas Parks and Wildlife Department. Throughout May 2006, FWS was kept informed of the progress of the technical/scientific team. FWS was involved in phone calls, emails and meetings with members of the technical/scientific team where the issue of alternative sites for the Refuge was discussed. (AR 2062-64, 2067, 2075-80, 2175-77, 2531-33, 2579.) According to the Texas Parks and Wildlife Department, the technical/scientific team spent considerable time mapping, researching, and discussing alternate sites, yet as of May 31, 2006, "an alternative site that is equal to or bigger and/or better than the North Neches site has not yet been identified." (AR 2051-52, TWDB 1028-29.) The alternate refuge sites had problems that made them undesirable: i.e., forest conditions, conflicts with previously identified reservoir sites, and land ownership issues. (AR 2052.) "At this point in time, there are too many unknowns regarding the appropriateness of the alternative sites. Criteria such as current forest condition and willingness of owners to sell have not been identified." (AR 2051; *see* AR 2052, 2531.) On June 7, 2006, HDR sent an email to FWS outlining the progress made to date, but failing to present an alternative site that is equal to or better than the Refuge site. (AR 2054-57.) FWS reviewed the email and noted it did not provide a viable alternative site. (AR 2054.) FWS continued to meet with the technical/scientific team after the FONSI had been signed and the Refuge boundaries had been established. (TWDB 982.) Even assuming there were

conflicting alternate Refuge sites available, FWS had discretionary authority to establish the Refuge in its current location.

In November 2007, HDR issued a final feasibility study report ("2007 Report") that analyzed four potential alternative preservation sites in detail. In its 2007 Report, HDR detailed its research findings of land ownership, conflicts with reservoir sites, preliminary hydrologic comparisons of the proposed Refuge and alternate sites, and landcover summaries with information on bottomland hardwood acreage. (2007 Report at 2-1.) According to Plaintiffs, much of the underlying data for the report was available to FWS before the Refuge decision was made. (State Mot. at 24.) The 2007 Report concludes that the Middle Neches River and Neches River South are of "apparent value greater than or equal to that of the" original Refuge site. (2007 Report at 4-1, 4-2.) The 2007 Report also states "there are opportunities for managed co-existence of Fastrill Reservoir and a significant portion of the planned [Refuge] for the multiple objectives of water supply and wildlife habitat management and preservation." (2007 Report at 4-1.)[8] Plaintiffs claim this evidence and these conclusions were available to FWS prior to May 31, 2006, and that these sites were better than the site chosen by FWS.

In *Sabine River*, the court stated that "where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of

---

[8] FWS objects to and moves to strike as extra-record evidence created after the final agency decision was made the Affidavit of William F. Mullican III (TWDB Ex. 1); Affidavit of Samuel K. Vaugh (TWDB Ex. 2); Affidavit of Samuel K. Vaugh (City App. at 1-7); *Fastrill Reservoir & Bottomland Hardwood Preservation Opportunities,* HDR Engineering, Inc., Nov. 2007 ("2007 Report") (TWDB Ex. 3.). The Federal Defendants also object to Plaintiffs using their Complaints as summary judgment evidence. The Court DENIES FWS's motion to strike to the extent the data contained in the Vaugh affidavits and the 2007 Report is used for determining whether FWS took the requisite hard look at the environmental consequences of its decision. Much of the data contained therein was available to FWS or was in its possession at the time the agency decision was made. With respect to the Mullican Affidavit and the verified Complaints, the motion to strike is DENIED as MOOT.

evidence." *Sabine River*, 951 F.2d at 678. The court may only review its decision for arbitrariness and capriciousness.

FWS had before it its own evaluation of the current site and its value for Refuge purposes. Using its own expertise in evaluating the properties of the land, FWS's Concept Plan identified the Neches River Refuge as "Priority 1" for conservation as far back as 1985. (AR 1169.) FWS staff conducted a site visit in January 2004 to evaluate the composition and condition of the land for refuge purposes. (AR 554-58.) It had evidence that no other proposed site was equal to the current site and the alternate refuge sites may have had problems that made them undesirable: *i.e.*, forest conditions, conflicts with previously identified reservoir sites, and land ownership issues. (AR 2051-53.) The fact that the area's bottomland hardwood cover is diminishing does not mean FWS was arbitrary in choosing the area for a refuge. (*See* AR 554 acknowledging deterioration of bottomland hardwoods in the region). In fact, it may be that FWS wants to preserve the bottomland hardwood cover that remains. FWS was entitled to establish the Refuge boundaries in the location it chose instead of in the areas proposed in the 2007 Report. The fact that FWS was faced with conflicting evidence does not establish that FWS acted arbitrarily or capriciously in choosing these particular Refuge boundaries over others.

Although FWS did not analyze the alternative of establishing a refuge in conjunction with the reservoir *in the EA*, the Record evidence establishes that FWS did consider and reject that alternative because the Reservoir would destroy the habitat FWS was trying to preserve. *See Sabine River*, 745 F.2d at 399. The Record contains sufficient evidence to support FWS's conclusion that the Reservoir project was speculative and inconsistent with FWS's objective. FWS did not act arbitrarily and capriciously given the available data at the time of the decision and in light of the fact

that establishment of the Refuge will have no significant impact on the environment. Given the deferential standard of review, the Court concludes that the FWS adequately considered alternatives and was not arbitrary or capricious in its decision to adopt Alternative B.

### 3. Use of Current Information in Environmental Assessment.

The City argues that FWS violated NEPA by failing to use "current information" in its EA, instead using a twenty-year-old analysis of the bottomland habitat. (City Mot. at 40-44; AR 19.)[9] The City argues the EA did not use current data and accurate scientific analysis in its discussions of the Refuge's alternatives or the Refuge's impacts on wildlife, vegetation, the environment, air, and socioeconomic conditions. (AR 1178-82, 1184, 2987.) FWS does not dispute that it relied on "certain older studies" and responds that its reliance on those older studies does not invalidate the EA. (Defs.' Resp. to City Mot. at 38.)

In this NEPA challenge, Plaintiffs must show that FWS's use of old data likely led to a flawed assessment of environmental consequences and that FWS's use of such data resulted in a decision that was arbitrary and capricious. The City contends that FWS's use of this outdated data caused FWS to overlook the fact that the area's bottomland hardwood cover has diminished from seventy-one percent to thirty-one percent since 1985. (2007 Report at 3-4.) The City presumes that the presence of waterfowl and other migratory birds would have changed in light of the diminishment of bottomland hardwoods habitat. (City Reply at 18.) FWS's own 2004 site visit noted that a portion of the land "had been partially harvested since we looked at the site in the late 1980s." (AR 554.)

---

[9] The twenty-year-old study to which the City refers is a 1985 FWS report entitled "Land Protection Plan for Bottomland Hardwoods, Category 3, Texas and Oklahoma."

It is important to remember that "the ultimate purpose of the EA is to lead to one of two findings: either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant [environmental] impact." *Spiller*, 352 F.3d at 238 (internal quotation marks omitted). Only when outdated information affects an agency's ability to properly assess the environmental impacts of its action does the NEPA analysis come into question. Thus, the Court must consider whether the data used by FWS was so deficient as to lead to a flawed assessment of the environmental consequences of the Refuge and an inaccurate evaluation of alternatives. The challenging party has the burden of making this showing.

The Record evidences that FWS met with the City, the UNRMWA, and the State of Texas Parks and Wildlife Department to discuss the Refuge proposal and plans for a Reservoir. The Record evidences that FWS evaluated the new information provided during those meetings, including the draft Feasibility Study, and decided to move forward with its approval of the Refuge proposal. (AR 2054-55, 2067.)

The City's briefing is replete with conclusions and speculation, but is lacking in detailed discussion of particular ways the new data and conclusions affect the ultimate environmental assessment. Despite spending considerable time mapping, researching and discussing alternate sites for the Refuge, Plaintiffs were unable to identify an area that was equal to or better than the Refuge site as of June 1, 2006. (AR 2052.) The City has not shown that more current data would have revealed the existence of a significant environmental impact or a different set of alternatives. Even if the alternatives set forth in the 2007 Report were considered by FWS, as stated *supra*, FWS had the discretion to decide between the conflicting evidence which it would accept. *See Sabine River*, 951 F.2d at 678. The City's repeated arguments that FWS "should have" done this, or "could have"

done that is not enough to show FWS acted arbitrarily and capriciously, given the deferential standard the Court must apply.

### 4. Evaluation of Economic Impacts on the City of Dallas.

The City argues that FWS acted arbitrarily and capriciously by failing to adequately consider the economic impacts of the Refuge on the City of Dallas. (City Mot. at 45-46.) The City reasons "there is nothing speculative about the fact that if the refuge is established it precludes the planned reservoir." (City Reply at 23.)

While this is true, what is speculative is the likelihood that the Reservoir would have been constructed at all, and the effect that not having the Reservoir at this location would have on the City's water supply. The speculative nature of these issues has been discussed at length, *supra*. FWS was not arbitrary or capricious in concluding that establishment of the Refuge's boundaries would not have a directly ascertainable economic impact on the City or the City's water supply.

### 5. Coordination with State and Local Agencies.

The City argues that FWS acted arbitrarily and capriciously by "ignoring state and local concerns" and by misleading state and local agencies into believing they were engaging in cooperative consultation with FWS. (City Mot. at 46.) The City also argues FWS was under a mandatory obligation to coordinate with affected state and local governments. Plaintiffs believe FWS did not conduct its NEPA analysis in good faith; that its apparent willingness to cooperate and consider alternate sites was a sham because FWS had prejudged the issue and was unwilling to consider any other options. (State Mot. at 27-28; City Mot. at 13-15.) The State points to two statements made by FWS Director Dale Hall. (State Mot. at 27-28.) In one email dated February 2005, then-Regional Director Hall sent an email to his staff giving them a "heads up" about the

proposed Reservoir in which he wrote, "it just doesn't make sense to flood out highly productive wetlands like these for a water project that has found no justified need." (AR 574.) Hall's second email, sent a month later, says "the smart way to approach this is not to be seen as saying 'no way,' but rather emphasizing the difficulty in replacing such an important, and limited bottomland hardwood resource and that we simply don't see how that could be done through mitigation." (AR 459.) The City also cites an email from FWS's Tom Baca in March 2005 that states "even if the full [City] council votes in favor of a study for Fastrill, by the time they get a study contracted and completed, we will hopefully have received the director's approval. (Trying to be an optimist :)." (AR 1768.) The City also quotes a portion of an email from Tom Baca who wrote in April 2006 that "to agree to some compromise mitigation proposal is not only biologically unsupportable, it is unconscionable in the realm of responsibility to the local citizenry. Just between us, a total betrayal." (AR 2191.)

These emails do not vitiate the good faith or reasonableness of the NEPA analysis. According to the Record, Tom Baca was not involved in the meetings with the reservoir proponents and was not the final decision-maker with authority to approve the Refuge boundaries. In fact, in an April 2006 email to Tom Baca, another FWS official wrote that "Jim Neal [is] on the team" to review the Reservoir proponents' proposal and he "will certainly look at their proposal very objectively." (AR 2191.) Then-Regional Director Dale Hall's email excerpts show that Hall, as an FWS official, was working to promote establishment of the Refuge — which was his job to do. The Record does not establish that FWS was participating in a scheme to feign cooperation in an attempt to appear in compliance with NEPA. Director Hall was a participant in phone calls and meetings with the Reservoir proponents — at the request of Plaintiffs and after the EA had been drafted —

to give them an opportunity to have their collective voice heard on the Refuge/Reservoir issue. FWS reviewed the materials and heard the arguments. FWS representatives traveled to attend meetings about alternative sites after the FONSI and EA were issued. Though there is evidence that FWS was very committed to this Refuge project, the evidence does not establish that the agency avoided conducting a proper NEPA analysis.

Plaintiffs also argue that FWS was not cooperative because Director Hall's June 1, 2006 deadline was arbitrary. They intimate that Director Hall unreasonably hurried the scientific/technical team in their task of identifying a viable alternate refuge site. Plaintiffs argue that FWS unreasonably placed the onus of identifying an alternate site onto the Reservoir proponents.[10]

FWS officially introduced its proposal for the Refuge to the public in June 2004. This was followed by the scoping phase, during which FWS identified the important issues to be analyzed in the EA. After conducting public meetings about the proposal, the EA was drafted in March 2005. The EA and FONSI were signed by Director Dale Hall in June 2006. It bears mentioning that during this time, the City worked to apply political pressure on FWS through a letter-writing campaign and by having local and state governmental bodies pass resolutions. (AR 1852-93, 1899-1900.) The City does not appear to have spent its time and resources during this period researching the feasibility of a joint Refuge/Reservoir project, an alternate refuge site, or an alternate reservoir site. There is no evidence in the Record and no mention in the briefing of any willingness or effort on the

---

[10]    The City's conclusory statement that the FWS "manufactured an arbitrary twenty-year planning horizon to avoid consideration of the reservoir in its alternatives analysis" is unsupported by the Record. (City Mot. at 36.) There is no evidence that using a twenty-year window for planning purposes is manufactured or arbitrary; nor is there evidence that FWS used that time frame to avoid consideration of the reservoir in its alternatives analysis. The State argues there is no basis in law or policy for FWS's twenty-year planning horizon for its Refuge. (State Mot. at 13-14.) The State notes that the Refuge is designed to last "essentially forever." (State Mot. at 13.) Yet FWS must set some kind of time frame for its evaluations; it cannot have an interminable planning period. Plaintiffs have not established that FWS's twenty-year planning period is arbitrary and capricious.

City's part to find an alternate reservoir site. Had Plaintiffs been working diligently on any of these objectives from June 2004 through April 2006, their request for more time might seem reasonable. But to complain that more time is needed to conduct research that could have and should have been done earlier seems disingenuous. Long after the scoping period had expired, the EA was drafted, and the public hearings concluded did Plaintiffs ask for more time to conduct their own research. After waiting nearly two years, FWS gave Plaintiffs an additional two months. It ended up taking Plaintiffs another year and five months to collect and analyze the data.

Plaintiffs implicitly argue that FWS should have waited another year and five months after the EA was signed for the remainder of the data to be collected and analyzed before making its decision to establish the Refuge boundaries. NEPA does not require an agency to delay a final agency decision indefinitely while others work to develop an alternative that will meet everyone's needs. Nor does NEPA require an agency to spend an unreasonable amount of time searching for an alternative.

NEPA does not mandate inter-agency consultation before a draft EA is prepared. Although the applicable regulations do not address the timing of inter-agency consultation in the preparation of an EA, they do provide that after preparing a draft EIS and before preparing a final EIS, the agency shall obtain the comments of other federal agencies and request the comments of appropriate state and local agencies. *See* 40 C.F.R. § 1503.1(a)(1), (2). The regulations further provide that an agency shall respond to such comments. *See id.* at § 1503.4(a). There is nothing in NEPA or the applicable regulations to suggest that the timing of consultations should be any different when an agency prepares a draft EA as opposed to a draft EIS.

FWS officially introduced its proposal for the Refuge to the public in June 2004. (AR 1971.) This phase, known as the "scoping" phase, was designed to assist FWS in identifying the "important issues to be analyzed in the environmental assessment for potential impacts of the proposal." (*Id.*) Before the proposal went public, elected officials including U.S. Senators, U.S. Congressional representatives, State Senators, State Representatives, and County Judges were notified of the proposal by letter. (*Id.*) FWS notified the affected landowners of the proposal by letter in July 2004. (*Id.*) FWS held two "scoping workshops" in July 2004 to provide information, answer questions, and elicit affected landowners' issues and concerns about the proposed Refuge. (*Id.*) FWS also notified the Texas Parks and Wildlife Department, the two County Farm Bureau presidents, and the Texas State Railroad. (AR 1971.) FWS conducted a presentation for the East Texas Regional Water Planning Group in October 2004. (AR 1971.)

After the EA was drafted in March 2005, it was publicly circulated to public officials; affected federal, state and local agencies; conservation organizations; academic institutions; affected landowners; and others expressing interest in the Refuge. (AR 1204, 1999.) These documents underwent public review from March 1, 2005 to May 31, 2005 and public hearings were held on May 10 and 11, 2005. (AR 1999.) A Fiscal Impact Analysis was conducted and distributed to the public. (AR 1972.) Both the City and the State were invited to voice their concerns and meet with FWS during that comment period (AR 567, 816).

During the comment period, FWS recorded and responded to 1693 written comments, many of which concerned the future of the Reservoir. (AR 1999-2028.) FWS received and responded to dozens of letters from state, federal, and local officials about the Refuge and the Reservoir. (AR 1337, 1344-45, 1358-59, 1366-67.)

After FWS's then-Regional Director Dale Hall approved the EA and issued the FONSI in July 2005, City and State officials asked FWS to delay its final decision and to meet with its representatives. (AR 1854, 1859-60.) FWS accommodated these requests, and on April 3, April 20 and May 10, 2006 — long after the comment period had passed — the then-Director Hall met with City and State Reservoir proponents about the future of the Refuge and the Reservoir. (TWDB 557-74; AR 2175-77, 2531-33, 2579.) The attendees at the meetings included representatives of the City, HDR, the UNRWA, the State, and FWS.

The Record demonstrates that FWS considered and responded to comments raised by other governmental agencies, including Plaintiffs, concerning the future of the Reservoir. The Record indicates that FWS took into account Plaintiffs' concerns before making its final decision and involved other government agencies before preparing its EA. (AR 1299, 1306-11); *See* 40 C.F.R. § 1501.4(b). That FWS did not agree with the objections raised by the City and the State and others does not undermine the adequacy of FWS's NEPA review.

The record reveals that FWS adequately considered that Plaintiffs wanted to use this land for a Reservoir, but FWS nevertheless chose to establish the Refuge boundaries in the area. A review of the claims and the record indicate that Plaintiffs' disagreement with FWS is more akin to a political dispute over policy choices than a legal dispute over compliance with the procedural requirements of NEPA. "Neither the language nor the history of NEPA suggests that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions. The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983). To permit Plaintiffs to use the provisions of NEPA to voice their policy objections to FWS's actions

and to hinder FWS's attempts to fulfill its mandate from Congress would be contrary to the purposes of NEPA.

## **CONCLUSION**

After careful consideration of the briefing and applicable law, the Court hereby DENIES the City of Dallas's Motion for Partial Summary Judgment and GRANTS the Federal Defendants' Cross-Motion for Partial Summary Judgment Concerning City of Dallas's NEPA Claims. The Court hereby DENIES the Texas Water Development Board's Motion for Partial Summary Judgment and GRANTS the Federal Defendants' Cross-Motion for Partial Summary Judgment Concerning the Texas Water Development Board's NEPA Claims. The Court DENIES in PART and DENIES as MOOT in PART the Federal Defendants' Motion to Strike Plaintiffs' Extra-Record Materials. The Court GRANTS the Texas Conservation Alliance's Motion for Leave to File Amicus Brief and the Amicus Brief. The Court GRANTS Friends of the Neches River's and Houston Audobon Society's Motion for Leave to File a Letter in Support of Texas Conservation Alliance's Amicus Brief. The Court GRANTS Texas Water Conservation Association's Motion for Leave to File Amicus Brief in Support of Plaintiffs' Motions for Partial Summary Judgment. The Clerk's Office is hereby instructed to file Docket Numbers 106-3, 111-2 and 123-1 in accordance with this Order.

It is SO ORDERED, this 30th day of June 2008.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE